**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PENNSPRING CAPITAL VII, LLC,** | **CIVIL ACTION NO.** |
| *Plaintiff*, | **JURY TRIAL DEMANDED** |
| v. | |
| **HCAP PARTNERS IV, L.P.; FRANK MORA; TIM BUBNACK; HOPE MAGO; BHAIRVEE SHAVDIA; KRISS LAW, LLC; SCOTT KRISS; ATLANTIC CLOSING & ESCROW, LLC; ACE TOPCO LLC F/K/A PSC ACE ACQUISITION LLC; SCOTT TAYLOR; DAVID CUTTLER; and SUSAN MAKIN,** | |
| *Defendants*, | |
| **HCAP IV BLOCKER, LLC; ACE CLOSING HOLDINGS, INC.; KL TITLE SERVICES LLC; VSI HOLDINGS, INC. F/K/A VILLAGE SETTLEMENTS, INC.; RDC ADVISORS, LLC; KRISS TITLE SERVICES, LLC; and NEW ENGLAND TITLE PARTNERS, LLC,** | |
| *Nominal Defendants.* | |

<u>**VERIFIED COMPLAINT**</u>

Plaintiff, PennSpring Capital VII, LLC ("**PSC**"), by and through its undersigned attorneys, Royer Cooper Cohen Braunfeld LLC, files this Complaint against Defendants, HCAP Partners IV, L.P. ("**HCAP**"), Frank Mora ("**Mora**"), Tim Bubnack ("**Bubnack**"), Hope Mago ("**Mago**"), Bhairvee Shavdia ("**Shavdia**"; with HCAP, Mora, Bubnack, and Mago, collectively, the "**HCAP Defendants**"), Kriss Law, LLC ("**Kriss Law**"), Scott Kriss ("**Kriss**"), Scott Taylor ("**Taylor**"), David Cuttler ("**Cuttler**"), and Susan Makin ("**Makin**"; with Kriss Law, Kriss, Taylor, and Cuttler,

collectively, the "**Kriss Law Defendants**"), Atlantic Closing & Escrow, LLC ("**ACE**"), ACE TopCo LLC f/k/a PSC ACE Acquisition LLC ("**ACE TopCo**" or "**PSC ACE Acquisition**"; with the HCAP Defendants, the Kriss Law Defendants, and ACE, collectively, the "**Defendants**"), and nominal defendants HCAP IV Blocker, LLC, ACE Closing Holdings, Inc., KL Title Services LLC, VSI Holdings, Inc. f/k/a Village Settlements, Inc., RDC Advisors, LLC, Kriss Title Services, LLC, and New England Title Partners, LLC (collectively, the "**Nominal Defendants**"), and avers as follows:[1]

## **INTRODUCTION**

1. This action arises from the illicit scheme of Defendants to deprive PSC of its ownership interests in an entity so that they alone could have the benefits therefrom.

2. In 2021, Kriss sold his company, ACE, to PSC, through its then wholly owned subsidiary PSC ACE Acquisition, for $23.5 million.  PSC ACE Acquisition and ACE may be referred to herein collectively as the "**Company**."

3. As part of the acquisition PSC, through PSC ACE Acquisition, borrowed funds from HCAP.

4. HCAP, however, was not satisfied simply being a lender and wanted its own share of ACE's profits.

5. Prior to the sale, ACE, a company that handles real estate closings, generated an average of $5,240,000 in EBITDA annually between 2017 and 2021.  There was no reason to believe it would not continue to perform as successfully as it had.

---

[1] For the avoidance of doubt, any reference herein to "Defendants" does not include the Nominal Defendants unless expressly noted.

6.      Soon after the sale, Defendants concocted a plan to usurp the opportunity presented by PSC, divest PSC of its ownership interests in PSC ACE Acquisition, and thereby oust it from the Company.  However, as discussed below, PSC did not find out about the scheme until years later.

7.      In the first piece of the plan, the Kriss Law Defendants, who had continued on with ACE after the sale to provide legal services and other support, torpedoed the cash flow and EBITDA.  The Kriss Law Defendants also caused the occurrence of covenant defaults under the relevant loan agreement through a failure to maintain financial ratios and through causing assets of the Company to be transferred to Kriss.

8.      With EBITDA down, HCAP refused to consent to PSC extending a line of credit ("**LOC**") to the Company, thereby causing the Company to miss one interest payment in the amount of roughly $200,000.

9.      HCAP took immediate and aggressive action – declaring defaults and accelerating the entire $17 million due under the loan over covenant defaults and a missed payment that amounted to less than 1.2% of the outstanding amount.

10.      Finally, HCAP issued a Notice of Disposition of Collateral and represented that it would immediately and aggressively seek to sell all the assets of the Company that it could.

11.      However, unbeknownst to PSC until the plan was finally revealed years later, HCAP never had any intention of executing on its collateral.

12.      HCAP, in concert with the other Defendants, was simply using the threat of the use of remedies available to it to force PSC to agree to restructure the loan in a manner that would give HCAP something it could not have obtained before – the ownership interests in PSC ACE Acquisition.

13. After the First Restructure, defined below, which PSC would only later learn was just the beginning, HCAP and Kriss took control of PSC ACE Acquisition and renamed it ACE TopCo.

14. Defendants then continued to intentionally make it appear that the Company was not profitable.

15. Notably, while covenant defaults and payment defaults similar to the ones that HCAP used as a pretext to accelerate the loan continued to occur after the First Restructure, HCAP never accelerated the debt again or took any action to marshal the assets.

16. When Defendants were trying to gain control of the Company, any and every default had to be addressed aggressively. Once they gained control, suddenly the same issues did not matter. In fact, the Defendants were negligent in their oversight and monitoring of the Company, not even obtaining financial reporting or cash flow forecasts.

17. Mora, acting individually and on behalf of HCAP, sought PSC's consent to enter into a Second Restructure, defined below.

18. Mora, acting individually and on behalf of HCAP, intentionally misrepresented to PSC that the Second Restructure was necessary based on an allegedly dire financial situation and a forecasted dip – while concealing that forecasting showed that the temporary dip in April and May 2024 was going to be followed by a rebound for the rest of the year.

19. Mora, acting individually and on behalf of HCAP, further materially misrepresented to PSC the terms of the Second Restructure and the status thereof.

20. PSC reasonably objected to the Second Restructure, as it had the right to do under the applicable contracts.

4

21.    Defendants, of course, did not care and consummated the Second Restructure over PSC's objection.

22.    PSC was not informed that the Second Restructure took place until almost a month after it was consummated.

23.    The Second Restructure was the final nail in the coffin, stripping the remaining interests that PSC had or could have obtained in the Company without any buyout or otherwise compensating PSC.

24.    The full extent of the years long scheme and the number of individuals and entities involved was not known to PSC until PSC began receiving documents from HCAP in a prior lawsuit beginning in March 2025.  PSC could not have known about the details of this scheme as it was agreed upon and carried out behind the scenes by Defendants.

25.    As a result of the foregoing, and as explained further below, PSC asserts claims against Defendants herein for:

     a.  Violations of the Racketeer Influenced and Corrupt Organizations Act;

     b.  Fraud;

     c.  Negligent misrepresentation;

     d.  Breach of contract;

     e.  Breach of the implied covenant of good faith and fair dealing;

     f.  Breach of fiduciary duty;

     g.  Tortious interference with contract;

     h.  Tortious interference with existing business relationship;

     i.  Aiding and abetting breach of fiduciary duty;

     j.  Civil conspiracy; and

    k.  Declaratory judgment.

## PARTIES

26.    PSC is a limited liability company organized under the laws of the State of Delaware.

27.    Operating out of its principal place of business in Lancaster, Pennsylvania, PSC is a private investment firm that routinely invests in and operates technology-enabled service businesses across multiple industries.

28.    ACE TopCo, formerly known as PSC ACE Acquisition, is a limited liability company organized under the laws of the State of Delaware.  This company will be referred to herein using the name that it had during the time period relevant to the allegations.

29.    PSC originally owned 100% of the membership interests in PSC ACE Acquisition, but was deprived of all of its interests as a result of Defendants' illicit scheme and currently does not own any units in ACE TopCo.

30.    Non-party Louis Castelli ("**Castelli**") is PSC's Managing Partner.

31.    HCAP is a limited partnership organized under the laws of the State of Delaware that, upon information and belief, owns ███████████ Units in ACE TopCo.

32.    Operating out of its principal place of business in La Jolla, California, HCAP markets itself as a firm "specializing in providing mezzanine debt and private equity for the lower-middle market, an area of the economy that has been traditionally underserved by institutional capital."  HCAP Partners, Our Approach, https://www.hcap.com/our-approach (last visited June 1, 2026).

33.    HCAP advertises itself as "a recognized impact investor providing growth capital to established small and medium-sized companies throughout the United States."  HCAP Partners, Growth Capital +, https://www.hcap.com/ (last visited June 9, 2026).

34.    Mora is a Senior Partner at HCAP.

35.    At all times relevant to this action, Mora worked alongside Bubnack, HCAP's Managing Partner; Mago, a Senior Partner at HCAP; and Shavdia, a Principal at HCAP.

36.    Upon information and belief, Mora is a citizen of the State of California.

37.    Upon information and belief, Bubnack is a citizen of the State of California.

38.    Upon information and belief, Mago is a citizen of the State of California.

39.    Upon information and belief, Shavdia is a citizen of the State of California.

40.    Upon information and belief, Mora, Bubnack, Mago and Shavdia are all members of HCAP's general partner, HFMC IV, LLC.

41.    Kriss Law is a limited liability company organized under the laws of the Commonwealth of Massachusetts and also registered to conduct business in the Commonwealth of Pennsylvania.

42.    Upon information and belief, Kriss is a citizen of the Commonwealth of Massachusetts who owns ████████████ Units and ████████████ Units in ACE TopCo.

43.    Kriss is the owner and operator of Kriss Law.

44.    Kriss Law is closely managed in connection with ACE.

45.    ACE is a limited liability company organized under the laws of the State of Rhode Island and also registered to conduct business in the Commonwealth of Pennsylvania.

46.    According to the Rhode Island Department of State, Kriss is the resident agent and manager of ACE.

47.     Kriss Law and ACE provide title, closing, and escrow services focused on residential real estate properties.

48.     Kriss markets ACE as "a member of the Kriss Law family bringing the firm's philosophy to the national commercial sector, residential lenders, entities providing investor services, and the default arena."  Kriss Law, About Us, https://krisslawatlantic.com/ (last visited June 1, 2026).  ACE "is directly licensed in over thirty states and provides fulfillment in all fifty." *Id.*  It is a "national, independent title agency backed by the resources of several major underwriters, [offering] clients a personalized, single point of contact."  *Id.*

49.     Upon information and belief, Taylor is a citizen of the Commonwealth of Massachusetts who owns ███████████████ Units in ACE TopCo.

50.     At all relevant times, Taylor was a Senior Partner at Kriss Law.

51.     Upon information and belief, Cuttler is a citizen of the Commonwealth of Massachusetts who owns ███████████████ Units in ACE TopCo.

52.     At all relevant times, Cuttler was a Senior Partner at Kriss Law.

53.     Upon information and belief, Makin is a citizen of the Commonwealth of Massachusetts who owns ████████████ Units in ACE TopCo.

54.     At all relevant times, Makin was the Chief Operating Officer of Kriss Law and ACE.

55.     Upon information and belief, nominal defendant HCAP IV Blocker, LLC is a limited liability company organized under the laws of the State of Delaware and owns ███████ ███████ Units in ACE TopCo.

56.    Upon information and belief, nominal defendant ACE Closing Holdings, Inc. is an entity incorporated under the laws of the Commonwealth of Massachusetts and owns ███████ ███████ Units in ACE TopCo.

57.    According to the Secretary of the Commonwealth of Massachusetts, Kriss is the registered agent, president, treasurer, secretary, and director of ACE Closing Holdings, Inc.

58.    Upon information and belief, nominal defendant KL Title Services LLC is a limited liability company organized under the laws of the Commonwealth of Massachusetts and owns ███████████ Units in ACE TopCo.

59.    According to the Secretary of the Commonwealth of Massachusetts, Kriss is the resident agent and manager of KL Title Services LLC.

60.    Upon information and belief, nominal defendant VSI Holdings, Inc. f/k/a Village Settlements, Inc. is an entity incorporated under the laws of the State of Maryland and owns ███████████ Units in ACE TopCo.

61.    Upon information and belief, nominal defendant RDC Advisors, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania and owns ██████████ Units in ACE TopCo.

62.    Non-party James S. Still ("**J.S. Still**") is the CEO of RDC Advisors, LLC.  J.S. Still also acted as the Company's independent director.

63.    Upon information and belief, nominal defendant Kriss Title Services, LLC is an entity incorporated under the laws of the Commonwealth of Massachusetts.

64.    According to the Secretary of the Commonwealth of Massachusetts, Kriss is the resident agent and manager of Kriss Title Services, LLC.

9

65.    Upon information and belief, nominal defendant New England Title Partners, LLC is an entity organized under the laws of the Commonwealth of Massachusetts.

66.    According to the Secretary of the Commonwealth of Massachusetts, Kriss is the resident agent and manager of New England Title Partners, LLC.

## JURISDICTION AND VENUE

67.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) over claims brought under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**").

68.    This Court has supplemental subject matter jurisdiction over PSC's remaining causes of action pursuant to 28 U.S.C. § 1367 as the conduct underlying such causes of action relates to, and forms part of, the same case or controversy.

69.    The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and 1965(d); indeed, pursuant to *Heller v. Deutsche Bank AG*, No. 04-CV-3571, 2005 WL 281181, at *2-3 (E.D. Pa. Feb. 3, 2005), personal jurisdiction in a civil RICO claim can be based on general or claim specific contacts.  Such general and specific contacts are set forth herein below.

70.    Additionally, Defendants' contacts with the Commonwealth of Pennsylvania are sufficient for the exercise of personal jurisdiction over them satisfying the standard set forth by the U.S. Supreme Court in *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945).

71.    Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

72.    Additionally, this action arises from Defendants' conduct directed at PSC and, thus, a substantial part of the events underlying PSC's claims occurred within this District.

10

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. Project Harpua

73.     In or around July 2021, PSC pursued an acquisition of ACE for $23.5M ("**Project Harpua**") through a holding company.

74.     At the time, ACE was owned and controlled by Kriss.

75.     PSC contacted HCAP to seek financing for the acquisition.

76.     HCAP determined that the opportunity PSC presented to it was attractive.

77.     HCAP believed that Kriss Law (and, in turn, ACE):

    a.  Had an entrenched market position in the Northeast region that benefited from the local relationship-based nature of the real estate industry;

    b.  Was known for utilizing the latest technology to enhance and improve the efficiency of the closing and escrow process;

    c.  Had multiple avenues of growth to pursue, including geographic expansion through acquisitions and additional business lines; and

    d.  Had a nimble business model that would allow HCAP to capitalize on current transaction volume and diversify revenue streams with a seasoned and successful team.

78.     HCAP additionally believed that real estate owned transactions provide countercyclical revenue growth that reduces volatility associated with the real estate market.

79.     Finally, HCAP believed that it was important for Kriss Law (and, in turn, ACE) to remain under the management of Kriss and the existing leadership team because, *inter alia*, Kriss had a strong reputation in the industry.

80.    For the above-referenced reasons (among others) HCAP loaned PSC ACE Acquisition and ACE $17M to facilitate the acquisition (the "**Original Loan**").

81.    ACE had historically been financially solvent, successful, and profitable, generating an average of $5,240,000 in EBITDA annually between 2017 and 2021.

82.    The terms of the Original Loan were documented in a Loan and Security Agreement by and between HCAP and the Company dated December 1, 2021 (the "**Loan Agreement**").  A true and correct copy of the Loan Agreement is attached hereto as Exhibit 1.

83.    Prior to the acquisition, Kriss operated ACE through Kriss Law from the Commonwealth of Massachusetts, which is an "attorney closing state."

84.    In Massachusetts, a licensed attorney must be involved in the real estate closing process to ensure legal compliance with the underlying real estate transaction services being provided to clients.

85.    Accordingly, for purposes of Project Harpua, Kriss and Kriss Law stayed involved with ACE after the acquisition through the execution of a certain Transaction Support and Administrative Services Agreement dated December 1, 2021 by and among Kriss Law, Kriss, and ACE (the "**TSA**").  A true and correct copy of the TSA is attached hereto as Exhibit 2.

86.    The TSA recites Kriss Law's "desire[] to focus on the delivery of legal services rather than on administrative matters and purely administrative tasks."  *Id.*

87.    ACE, on the other hand, as reflected in the TSA, was to be an "***independent*** entity to assist Kriss Law in growing and continuing its business through the provision of a variety of transaction and business support services" described therein.  *Id.* (emphasis added).

88.     The fees to be paid to Kriss Law under the TSA were based on the fair market value of the services provided and expressly acknowledged as reasonable by Kriss Law. *Id.* at §§ 4.1, 4.2.

89.     Separately, Kriss was an employee of ACE pursuant to an employment agreement dated December 1, 2021 by and between himself and ACE (the "**Employment Agreement**").  A true and correct copy of the Employment Agreement is attached hereto as Exhibit 3.

90.     At bottom, HCAP made the Original Loan of $17M to PSC ACE Acquisition, which was created and owned by PSC, so that PSC could purchase ACE from Kriss for approximately $23.5M.

91.     While PSC owned 100% of the ownership interests in PSC ACE Acquisition at closing, HCAP received warrants to purchase up to 12% of the equity in the company for the nominal amount of $100.

92.     As part of the deal, HCAP asked for a pledge of the ownership interests in PSC ACE Acquisition as part of the agreement.

93.     PSC refused.

94.     After significant back and forth, HCAP agreed to forego any pledge.

95.     Only now can PSC see that HCAP caved on this issue because it had a plan to otherwise get to the interests in PSC ACE Acquisition and oust PSC, which plan is discussed further below.

96.     The sale to PSC included a cash payment to Kriss for his equity interest in ACE, and PSC entered into a seller's note in favor of Kriss for the approximate sum of $3.5M (the "**Seller's Note**").

97.     Project Harpua closed in December 2021.

13

98. Upon closing, the ownership status for the entities involved was as follows:

   a. PSC ACE Acquisition – 100% owned by PSC;

   b. ACE – 100% owned by PSC ACE Acquisition;

   c. Kriss Title Services, LLC – 50% owned by PSC ACE Acquisition and 50% owned by non-party RG Title, LLC; and

   d. New England Title Partners, LLC – 50% owned by PSC ACE Acquisition and 50% owned by non-party JD Title Ventures, LLC.

**B. Defendants Scheme to Manufacture a Default Under the Loan Agreement to Push PSC Out of the Company**

99. Under the terms of the Loan Agreement, HCAP had very little express power over the Company. That power was essentially limited to the right to appoint one manager for PSC ACE Acquisition's Board of Managers and observe board meetings. *See* Ex. 1 at §§ 5.11, 5.12.

100. However, HCAP wanted more.

101. Recognizing and appreciating the advantages of ultimately obtaining a majority stake in the underlying business that PSC had only recently purchased from Kriss, Defendants concocted a scheme to: (i) exile PSC from its ownership position in the Company; (ii) return a minority but substantial equity stake in ACE back to Kriss; (iii) incentivize Kriss to expand ACE's business through Kriss Law while HCAP sat back idly; (iv) have ACE managed with a view towards an ultimate exit that would not include PSC; and (v) artificially deplete ACE's financial viability in the short term to provide cover for the coup.

102. Kriss, individually and through Kriss Law, took an active role in directing the underlying business of ACE.

103. In furtherance of the scheme, soon after the closing, Kriss, individually and through Kriss Law, began intentionally mismanaging ACE to cause a decline in EBITDA.

104. Kriss was aided by Makin, the COO of Kriss Law and ACE, as well as Taylor and Cuttler, both partners at Kriss Law.

105. Makin acted as Kriss' lieutenant, handling the so-called split between Kriss Law and ACE as part of the sale and handling the day-to-day management of Kriss Law. Makin also played a significant role in maintaining the books and records of ACE.

106. Notably, while the Kriss Law Defendants were intentionally creating a cash flow problem for the Company, cash flow problems existed at Kriss Law.

107. Upon information and belief, Makin, Taylor, and Cuttler not only refused to reduce their bloated salaries or otherwise help the Company cut down on costs but caused the Company to transfer money to Kriss Law. The only way these individuals were able to maintain, or indeed even draw, salaries was because of improper cash infusions.

108. Upon information and belief, rather than acting as partners and not paying themselves when times were tough, Taylor, Cuttler, and Makin participated in the scheme along with the other Kriss Law Defendants to take funds from the Company for their own personal enrichment through Kriss Law.

109. HCAP, for its part, acted beyond its mere role as a private financial lender to a family investment office and took an active role in directing the underlying business of ACE.

110. HCAP was aided in the scheme by Mora, Bubnack, Mago, and Shavdia.

111. For example, on May 12, 2022, Shavdia sent Bubnack an email listing "a few transaction options to facilitate [PSC's] exit from the equity stack." A true and correct copy of the May 12, 2022 email is attached hereto as Exhibit 4.

112. On or about May 13, 2022, HCAP issued a Notice of Default Letter to PSC based solely on the Company's "failure to maintain a ratio of Funded Debt to consolidated EBITDA as

set forth in Section 5.6(b) of the Loan and Security Agreement for the period ended March 31, 2022" (the "**Notice of Default**").  A true and correct copy of the Notice of Default is attached hereto as Exhibit 5.

113.    The Notice of Default was signed by Shavdia and was sent via mail and email.  *Id.*

114.    Not long after the Notice of Default was sent, Kriss emailed Shavdia and Bubnack to summarize a call he had with Castelli about how to move forward with the business.  A true and correct copy of the May 24, 2022 email is attached hereto as Exhibit 6.

115.    Therein, Kriss states: "He seems to have no inkling that we've been talking and I suggest we keep it that way as he seems to be showing me his hand."  *Id.*

116.    While the Kriss Law Defendants continued to decrease the Company's EBITDA and cash flow, the HCAP Defendants continued to aggressively apply pressure on PSC through the Original Loan.

117.    The lack of cash flow rendered the Company unable to make the interest payment due to HCAP on July 1, 2022.

118.    PSC previously had offered to fund a LOC for the Company to address the cash flow problem.  However, HCAP's consent for such a loan was required under Section 5.5 of the Loan Agreement.

119.    Although HCAP's consent was "not to be unreasonably withheld," it failed and/or refused to consent to the extension of a LOC.

120.    HCAP's stated reason for refusing to consent to the LOC was because PSC wanted the HCAP debt to be subordinate to any LOC debt.

121.    However, this was just a pretense as evidenced by HCAP's later agreement to subordinate its debt to a LOC from a different lender as discussed further below.

122. Soon thereafter, on July 14, 2022, HCAP issued a Notice of Default, Acceleration, and Reservation of Rights Letter to PSC (the "**Notice of Acceleration**"). A true and correct copy of the Notice of Acceleration is attached hereto as Exhibit 7.

123. In the Notice of Acceleration, HCAP stated that the Company defaulted under the Loan Agreement by: (1) failing to make the interest payment of roughly $200,000; (2) failing to deliver "monthly company-prepared consolidated financial statements; aged listings by invoice date of accounts payable and accounts receivable; or, a Compliance Certificate"; (3) transferring assets of the Company constituting Collateral to Kriss Law, LLC; and (4) failing "to maintain consolidated EBITDA for the prior four (4) fiscal quarters on a rolling basis of not greater than 3.50 to 1.00." *Id.*

124. To be clear, each alleged default, to the extent it existed, was directly caused by the conduct of Kriss, individually and through the other Kriss Law Defendants, and in connection with the HCAP Defendants.

125. As a result of the alleged defaults, HCAP purported to accelerate all of the amounts due under the Original Loan pursuant to Section 6.2 of the Loan Agreement, which HCAP claimed to be $17,443,104.74. *Id.*

126. Notably, Section 6.2 of the Loan Agreement includes both a "mandatory" acceleration clause and a "permissible" acceleration clause as follows:

> 6.2 Remedies. Upon the occurrence and during the continuance of an Event of Default, all unpaid principal, accrued interest and other amounts owing hereunder shall, at the option of Lender (or, upon the occurrence of an Event of Default under Section 6.1(b), shall automatically without any further action by Lender or any other party) be immediately due and payable and collectible by or on behalf of Lender, and Lender may exercise all of the rights of a secured party under the Uniform Commercial Code and any other applicable law, including, without limitation, acceleration of the amount due under the Note.

Ex. 1 at § 6.2.

127.    In other words, the Original Loan would ***automatically*** accelerate under the ***mandatory*** language in the parenthetical of Section 6.2 if an Event of Default occurred under Section 6.1(b).  *Id.*

128.    Section 6.1(b), in turn, provides that an Event of Default shall occur if

Borrower becomes unable to pay its debts (including trade debts) as they mature, or becomes the subject of any case or proceeding under the United States Bankruptcy Code or other law relating to the reorganization or restructuring of debt which has not been stayed or dismissed within forty-five (45) days of the filing . . . or any material portion of Borrower's assets is attached or becomes subject to levy or similar judicial proceeding that is not released within ten (10) Business Days or in any event no later than five (5) Business Days prior to the date of any proposed sale thereunder[.]

*Id.* at § 6.1(b).

129.    Alternatively, the Original Loan ***could*** be accelerated as a matter of HCAP's discretion under the ***permissive*** language allowing acceleration following any other Event of Default "at the option" of HCAP.  *Id.* at § 6.2.

130.    HCAP did not declare an Event of Default under Section 6.1(b) in the Notice of Acceleration or at any other time (for example, when the Company breached its covenants later in 2023 and 2024).  Ex. 7.

131.    Thus, HCAP purported to exercise its discretion to accelerate ***over \$17 million in debt*** "at its option" based upon one missed payment (***which accounted for less than 1.2% of the accelerated amount***) and covenant defaults.

132.    As discussed further below, HCAP never enforced these covenants again or declared any default in connection thereto after using them as a purported basis to accelerate the debt at this time.

133.    The Notice of Acceleration was signed by Mora and sent via email.  *Id.*

134.   Furthering the plan even more, on or about July 26, 2022, HCAP issued a Notification of Disposition of Collateral by Private Sale (the "**Notice of Disposition**").  A true and correct copy of the Notice of Disposition is attached hereto as Exhibit 8.

135.   The Notice of Disposition was signed by Bubnack and sent via mail.  *Id.*

136.   As evidenced by Exhibit A to the Notice of Disposition, the collateral subject thereto was consistent with the definition and use of the term in the Loan Agreement (the "**Collateral**").  *Id.*

137.   The Collateral did not include the limited liability company interests of PSC ACE Acquisition.  *Id.*

138.   The limited liability company interests of PSC ACE Acquisition were not certificated, there was no pledge agreement executed in connection with the Collateral, and there were no related UCC filings.

139.   Notably, as discussed above, HCAP had pushed for the interests to be included as Collateral at the time the Original Loan was made, but PSC refused to agree to a pledge.

**C. Defendants Force the Company Into the First Restructure**

140.   Knowing that the ownership interests in PSC ACE Acquisition did not constitute Collateral under the Loan Agreement, and thus the manufactured defaults would not allow Defendants to oust PSC from the Company, Defendants used the threat of execution and other potential remedies to force the companies to restructure their relationships and investments with each other (the "**First Restructure**").

141.   Under the First Restructure: (1) PSC redeemed its equity interest in ACE TopCo, LLC (the new name for PSC ACE Acquisition); (2) HCAP converted a portion of the principal of the Original Loan to equity in the company; and (3) PSC and HCAP entered into a certain

Participation Agreement dated as of September 20, 2022 (the "**Participation Agreement**"). A true and correct copy of the Participation Agreement is attached hereto as Exhibit 9.

142. The First Restructure had several contemporaneous components.

143. First, HCAP and the Company entered into an amendment to the Loan Agreement dated September 20, 2022 (the "**First Amendment to LSA**"). A true and correct copy of the First Amendment to LSA is attached hereto as Exhibit 10.

144. Pursuant to the First Amendment to the LSA, the principal of the Original Loan was reduced to ▮▮▮▮ (hereinafter, the reduced principal of the Original Loan is referred to as the "**Loan**") of which ▮▮▮ originated from PSC's own restructuring as described in the Participation Agreement.

145. Additionally, pursuant to the First Amendment to LSA, ACE TopCo issued equity interests and HCAP converted its ▮▮▮ of reduced principal into ▮▮▮▮▮▮▮▮ Units in the Company.

146. Second, on the same day that HCAP reduced the Loan, PSC redeemed its outstanding equity interest in ACE TopCo in exchange for: (i) ▮▮▮ in cash; (ii) ▮▮▮ in indebtedness to the company on the same terms as the Loan; and (iii) rights to warrants to redeem for equity on the same terms as HCAP, on a pro rata basis (the "**Redemption Warrants**").

147. The last part of the First Restructure involved two sales. First, PSC sold its indebtedness resulting from its redemption of equity in ACE TopCo, and the Redemption Warrants, to HCAP. Second, pursuant to the Participation Agreement, HCAP sold to PSC an undivided participation interest in the Loan, together with any promissory notes and other loan documents, and the security collateralized by the Company's obligations under the loan documents. This

20

second sale was in exchange for the first sale of PSC's ▇ indebtedness and the Redemption Warrants.

148. But for Defendants manufacturing a default and HCAP threatening to execute on the entire $17 million indebtedness to force the companies to restructure their relationships and investments with another, PSC would not have agreed to enter into the First Restructure.

149. Leading up to and throughout the First Restructure, the HCAP Defendants were working closely in concert with the Kriss Law Defendants to achieve the result of the First Restructure.

150. HCAP's and Kriss's ultimate end goal was to take over the business of the Company with a view to a future exit that would exclude PSC.

151. Also, for HCAP, it was a matter of strengthening its portfolio and boosting its position with investors at large.

152. Having helped manufacture a default, HCAP would not have wanted to report to its investors that one of its loans was not performing. Indeed, reporting bad numbers would drive down the overall performance of the portfolio and repayment ratio.

153. By taking a portion of the loan debt off its books and exchanging it for equity, HCAP was able to bolster its performance, derisk the loan, and report a win to investors.

154. The results of the First Restructure were right in line with the ultimate end goal.

155. PSC was forced to exchange its debt in ACE TopCo for equity.

156. HCAP became not just a lender in ACE TopCo, but also an equity holder.

157. Kriss indirectly regained a portion of the ownership interests in ACE, the company that he chose to sell to PSC.

158.    By the time the First Restructure was consummated, HCAP and Kriss owned about ████████ of ACE TopCo, respectively.

159.    HCAP had the right to appoint three of ACE TopCo's five board members, with Kriss serving in one seat and a seat reserved for a mutually agreed upon appointment.

160.    This was a complete 180-degree flip to the benefit of HCAP from its position under the Loan as originally structured.

161.    HCAP went from having almost no control over the Company and relying on Kriss to gaining substantial control.

162.    HCAP's position as both a lender and owner in the Company resulted in a severe, but purposeful, conflict of interest.

163.    Contemporaneously with the execution of the Participation Agreement, HCAP required that ACE TopCo amend and restate its Limited Liability Company Agreement (the "**A+R LLC Agreement**").[2]  A true and correct copy of the A+R LLC Agreement is attached hereto as Exhibit 11.

164.    HCAP forced PSC's hand with respect to the First Restructure and was not transparent about the deal terms and the impact thereof because, *inter alia*, HCAP wanted Castelli out of the picture.

165.    Indeed, Mora suggested that HCAP represent to Castelli that certain warrants would not be diluted in order to get the First Restructure through while representing to Kriss that HCAP would make the warrants dilutive post-closing as follows:

---

[2] HCAP also amended and restated ACE TopCo's limited liability company agreement on or about January 13, 2023 (the "**Second A+R LLC Agreement**").  HCAP later amended and restated ACE TopCo's limited liability company agreement a third time on or about August 22, 2023 (the "**Third A+R LLC Agreement**"), and again on or about June 10, 2024 (the "**Fourth A+R LLC Agreement**").  A true and correct copy of the Fourth A+R LLC Agreement is attached hereto as Exhibit 14.

Yes, regarding the dilution.  Thinking big picture, since we are already going to own a substantial piece post restructure, I was wondering whether giving in on the dilution might be a better signal for [Kriss] and [Kriss' counsel] that will make them feel more aligned with us?  That said, if we give that up now, [Castelli] would shout and may delya [SIC] closing this deal asap.  My thought is we compromise in the middle.  We leave the warrant as is for now and explain to [Kriss] and [Kriss' counsel] that this is how the original warrant worked and we wont [SIC] get [Castelli] to agree to anything else today.  That said, post this deal and before and new money goes in, we will agree to amend our warrant to make it dilutive.  We don't expect [Castelli] to agree, but at that point we are only dealing with 1% non-dilutive, which is not too large a disincentive for new money to come in.

A true and correct copy of the September 12, 2022 email is attached hereto as Exhibit 12.

166.    On September 23, 2022, three days after the First Restructure closed, Kriss' counsel emailed HCAP's counsel, with a copy to Kriss and Shavdia, to provide a list of items that were "open to further discussion and completion" "*[n]ow that we have [Castelli] out of the picture*[.]" *See* September 23, 2022 email, a true and correct copy of which is attached hereto as Exhibit 13 (emphasis added).

### D.  HCAP's Conflicts of Interest: Owner and Lender

167.    Following the First Restructure—once PSC and Castelli were "out of the picture" as Defendants wanted—the HCAP Defendants continued working in concert with the Kriss Law Defendants in furtherance of their scheme.

168.    The foregoing included overtly acting in their own self-interest by, *inter alia*, amending Kriss's Employment Agreement (the "**Amended Employment Agreement**") as well as the TSA (the "**Amended TSA**").  A true and correct copy of the Amended Employment Agreement is attached hereto as Exhibit 15.  A true and correct copy of the Amended TSA is attached hereto as Exhibit 16.

169.    Both the Amended Employment Agreement and the Amended TSA provided Kriss with an increased ability to exert domination and control over ACE in concert with HCAP—and

23

ultimately commingle ACE with Kriss Law—while also providing larger potential financial upside to Kriss.

170.    The Amended TSA was required to reflect fair market value and be an arm's length deal.

171.    However, this was not true.  Kriss redid the agreement and executed it on behalf of himself *and* the Company.  *Id.*

172.    Notably, under the Amended Employment Agreement, Kriss' annual salary increased from ▮▮▮▮ per year to ▮▮▮▮ per year – a ▮▮▮▮ increase while there were *allegedly* severe cash flow problems with ACE.  *Compare* Ex. 3 at Schedule I *with* Ex. 15 at § 4.1.

173.    PSC did not receive a copy of the Amended TSA despite repeated requests.

174.    At the same time, when PSC was no longer an equity owner of ACE TopCo or ACE, the Company's financial situation *allegedly* worsened.

175.    Despite the *allegedly* worsened financial condition of the Company, HCAP did not make any attempt to sell the Company or avail itself of the benefits of declaring bankruptcy.

176.    HCAP never declared a covenant default under the Loan, accelerated the debt, or made any effort to marshal the assets.

177.    HCAP also never enforced its ability to take control of the Company's bank account pursuant to a Deposit Account Control Agreement which was required as part of the LSA.

178.    The failure to aggressively enforce the loan covenants was, again, a 180-degree change in HCAP's position from before the First Restructure.

179.    Instead, as co-owners of the Company, HCAP and Kriss began manipulating the Company's financial information, which made it appear as though the Company was in a worse financial condition than it actually was.

24

180.    This was done with a view towards finally pushing PSC out of the business entirely.

181.    For example, the Company first contemplated taking out a LOC with Leader Bank in August 2022—i.e., prior to the First Restructure when PSC was still an owner of the Company.

182.    However, HCAP and Kriss waited to obtain a LOC from Leader Bank until January 2023—i.e., following the First Restructure when HCAP and Kriss were owners of the Company.

183.    The LOC obtained from Leader Bank in January 2023 was approved for up to ██████.

184.    It added significant debt to the Company's balance sheet.

185.    The Leader Bank Loan Agreement was executed by Kriss after he became an owner of the Company following the First Restructure.

186.    Neither HCAP nor Kriss informed PSC that it was obtaining a line of credit from Leader Bank.

187.    Leader Bank did not act as a traditional lender because a traditional lender would have held the Company to higher standards.

188.    Without PSC's knowledge or consent, the Company borrowed additional funds from Leader Bank in February 2024, which resulted in a showing of decreased viability on the part of the Company as well.

189.    Additional funds should not have been necessary at this time.  The only reason that a LOC was needed prior to the First Restructure was to ensure funds were available to make payments to HCAP.  Such payments were waived through the First Restructure.

190.    Notably, while HCAP had purportedly based its earlier refusal to consent to PSC extending a LOC to the Company on the fact that PSC wanted HCAP's debt to be subordinate, HCAP ultimately agreed to subordinate its debt to Leader Bank.

191.    The Participation Agreement both entitled PSC to financial information about the Company and required HCAP to seek PSC's consent in connection with additional debt.  *See* Ex. 9 at §§ 3.01, 3.03(a).

192.    In the interim, HCAP began monitoring the Company's financial performance on an as if consolidated basis with Kriss Law beginning in July 2023.

193.    This is not what was contemplated by the Loan Agreement nor the Participation Agreement.

194.    This accounting change made the financial condition of the Company appear significantly worse than it was.

195.    The same result occurred by virtue of the Company acquiring Village Settlements in November 2023.

196.    The Company paid ▮▮▮ for Village Settlements despite only expecting ▮▮▮ in cost savings.

197.    What the Village Settlements acquisition did do, though, was add another group of real estate professionals to "the Kriss Law family," which, in turn, assisted with the Company's ability to better prepare itself for an eventual exit in future years; one in which, as discussed herein, Defendants planned to exclude PSC from participating in.

198.    With the same view towards such an eventual self-serving exit without PSC, the Company formed and hired an entire commercial services division in the first quarter of 2023.

199.    However, the decision was so transparently unjustified from a financial perspective that the Company dismissed the entire division shortly thereafter in March 2024.

200.    Perhaps most egregiously, HCAP and the Company entered into a Waiver and Second Amendment to Loan & Security Agreement (the "**Second Amendment to LSA**") dated

September 29, 2023. A true and correct copy of the Second Amendment to LSA is attached hereto as Exhibit 17.

201. HCAP waived the Company's default under Section 5.6 of the Loan Agreement, as amended, for failing to maintain a Total Leverage Ratio of not greater than 3.50 to 1 for the fiscal quarters ending March 31, 2023 and June 30, 2023, which were then-existing defaults. *Id.* at § 2.

202. HCAP and the Company amended Section 1.2(b)(ii) of the Loan Agreement to defer interest payments becoming payable until June 30, 2025. *Id.* at § 3(A).

203. Further, HCAP and the Company amended Section 5.6(b) of the Loan Agreement such that the Company need only maintain unrestricted cash plus availability under any LOC permitted under the Loan Agreement in the amount of ████. *Id.* at § 3(B).

204. HCAP and the Company also amended (and expanded) the definition of "Permitted Indebtedness" to include a Secured Promissory Note by and between the Company and Kriss. *Id.* at § 3(D). Allowing this alleged indebtedness without seeking or receiving PSC's consent violated Section 3.01 of the Participation Agreement. *See* Ex. 9 at § 3.01.

205. Kriss executed the Second Amendment to LSA on behalf of ACE TopCo and ACE. Ex. 17.

206. Mora executed the Second Amendment to LSA on behalf of HCAP as Lender. *Id.*

207. HCAP did not inform PSC of the fact that it entered into the Second Amendment to LSA until December 11, 2023.

208. PSC's consent to the Second Amendment to LSA was neither requested nor obtained.

209. While all of the foregoing was taking place, the Company was required to provide PSC financial statements pursuant to the Participation Agreement.

210. Yet, HCAP failed to do so for the reporting periods ending (without limitation) on September 30, 2022, October 31, 2022, November 30, 2022, December 31, 2022, January 31, 2023, February 28, 2023, March 31, 2023, April 30, 2023, May 31, 2023, June 30, 2023, July 31, 2023, September 30, 2023, October 30, 2023, November 30, 2023, December 31, 2023, January 31, 2024, February 28, 2024, and March 31, 2024.

211. Mora previously confirmed under oath his understanding that HCAP was obligated to provide these financial reports to PSC.

212. In fact, when Mora was questioned during a deposition on April 30, 2026 about the reasons for which financial reports had not been sent to PSC, Mora replied "I don't have a good answer for that other than to say I don't know."

213. Relatedly, Mora also testified that HCAP is still not reporting as it should be.

214. Indeed, despite all of Defendants' conduct set forth above, HCAP failed to notify PSC that the Company had breached a covenant on the participated Loan in the first quarter of 2023.

215. Likewise, HCAP failed to notify PSC that the Company breached a covenant on the participated Loan in the second quarter of 2023 and that HCAP would not be enforcing the covenant.

216. Leading up to the execution of the Second Amendment to LSA—on or around August 1, 2023—HCAP failed to notify PSC of its failure to collect interest payments from the Company that became due.

217. On or around September 1, 2023, HCAP again failed to notify PSC of its failure to collect interest payments from the Company when such payments became due.

218.    In fact, HCAP provided PSC with an update on the Company on or about September 29, 2023 (upon request from PSC) but failed to mention that the Company had breached those certain financial covenants.

219.    These failures are representative only and not exhaustive.

220.    These failures show the malicious intentions behind Defendants' conduct – which was not discovered until long after the events took place–and the willful, wanton, and outrageous nature thereof.

221.    HCAP's willingness to overlook covenant and payment defaults once it was part of the equity stack is not indicative of poor mismanagement.

222.    Rather, changing from strict enforcement of the loan terms and aggressive action before the First Restructure to a complete disregard for covenants and payment requirements after the First Restructure shows that HCAP never actually intended to call the debt and, instead, used the threat of such action as a mere piece of the plan to oust PSC.

223.    The foregoing failures of HCAP to honor its obligations to PSC and otherwise act unlawfully were all committed during HCAP's ownership period and in active concert with the Kriss Law Defendants for an illicit purpose.

**E. Transfers From the Company to Kriss**

224.    Between May 1, 2022 and September 2022, the Company transferred well over a million dollars to Kriss and Kriss Law.

225.    These transfers occurred after PSC's day-to-day involvement with the Company ceased and PSC no longer had any meaningful visibility into the Company.

29

226.    PSC's day-to-day involvement with the Company ceased, in part, because HCAP refused to consent to the Company compensating PSC for performing financial services on behalf of the Company.

227.    In fact, in June 2022, the Company's Controller informed Castelli over the phone that he was told to work directly with HCAP regarding the transfer of monies between the Company, on the one hand, and Kriss and Kriss Law, on the other hand (which should have been pursuant to the terms of the TSA and Employment Agreement, if at all).  Furthermore, the Company's Controller informed Castelli during this phone call that HCAP informed him not to provide the foregoing information to PSC.

228.    Ultimately, PSC obtained ACE's 2022 General Ledger from Burke & Associates CPAs, Inc. in late 2023.

229.    PSC requested the same detail for Kriss Law numerous times with Mora having full knowledge of the requests being made.

230.    Despite the foregoing (and its contractual rights), PSC was able to obtain Kriss Law's profit and loss statement.

231.    Kriss Law's profit and loss statement showed TSA *expenses* recorded on behalf of Kriss Law—instead of ACE—throughout PSC's ownership period.

232.    These expenses totaled more than ███ .

233.    PSC requested—but was never provided—confirmation of its calculations from HCAP, ACE, Kriss Law, nor their advisors.

234.    PSC issued a Form 1099 to Kriss Law for these expenses.  Neither HCAP, ACE, Kriss Law, nor their advisors confirmed receipt of the 1099, or the calculation of expenses.

235.    Thereafter, following the First Restructure, HCAP failed to provide PSC with any of the information it was required to obtain from the Company, including financial information, covenant calculations, and projections, as described more fully herein above.

236.    Notwithstanding, Mora confirmed under oath that there were many instances of assets being transferred from ACE to Kriss Law during this time period—including through the Second Restructure.

237.    To this end, when Mora finally provided certain limited information to PSC, PSC's review of the same showed the Company was profitable and solvent.

238.    Year-to-Date calculations through April 2024 (the "**4/30 YTD**") demonstrated the Company had generated approximately ███████ of EBITDA, annualized to approximately ████████. A true and correct copy of the 4/30 YTD is attached hereto as Exhibit 18.

239.    While total debt was presented as ██████, approximately ██████ of that was HCAP's term loan, which was not amortizing or charging cash interest.  *Id.*

240.    PSC also noted that ████████ of the debt corresponded to a note payable associated with HCAP.  *Id.*

241.    Upon information and belief, the foregoing amount represented the ████ in *equity* HCAP purportedly put into the Company in 2022.

242.    If it were in fact debt, it would have represented an additional breach of the Participation Agreement.

243.    If PSC is correct that it was in fact equity, HCAP and Kriss Law presented PSC with a materially inaccurate depiction of the Company's total debt at the time Mora requested PSC's Consent via email.

244. Regardless, the only remaining liabilities were a note payable for ▓▓▓▓▓ (presented as an "interest only" seller note) and a LOC in an amount of ▓▓▓▓▓.

245. Upon information and belief, the source of ACE's insolvency was due to the fact that it transferred funds to Kriss Law, as evidenced by the ▓▓▓▓▓ "Due from Kriss Law" on the face of the balance sheet that PSC was provided. Ex. 18.

246. Based on the financial information that PSC did receive during *its* ownership period, said receivable had increased by ▓▓▓▓▓ during HCAP's ownership period.

247. But—as mentioned herein above—Kriss Law is not the "borrower" of the underlying Loan.

248. Losses incurred by Kriss Law during the time period relevant hereto should have been funded by Kriss, Cuttler, and Taylor as equity owners and/or partners of Kriss Law (or by obtaining a LOC or the like that did not violate the contractual terms of the various documents executed by the parties).

249. HCAP and Kriss Law intentionally attempted to conceal such conduct as aforesaid by, *inter alia*, entering into the self-serving Amended TSA and Amended Employment Agreement without PSC's knowledge or consent, as described further below.

250. At bottom, significant funds were transferred from the Company to Kriss Law on or after May 1, 2022 that were not authorized by PSC and, further, not permitted by the controlling documents.

251. Specifically, the LSA required the TSA to "remain, in full force and effect." Ex. 1 at § 4(dd). The TSA, in turn, *only* allows payment of certain reasonable service fees. Ex. 2 at §§ 4.1, 4.2. Thus, any and all transfers in excess of reasonable service fees constitute breaches of both the TSA and the LSA.

32

252. The 4/30 YTD showed that Kriss Law had only generated approximately ▇▇▇ of revenue while incurring approximately ▇▇▇ in expenses.

253. Upon information and belief, the net loss was funded by the Company via such transfers.

254. Upon information and belief, Kriss even took out approximately ▇▇▇ of his equity in Kriss Law, as evidenced by a "Due from SDK [Scott D. Kriss] (personal)" line item on Kriss Law's balance sheet.

255. The cash shortage that was the pretext for, *inter alia*, the Second Restructure, explained further below, was created by these transfers to which PSC never consented.

256. Kriss controlled the Company's bank accounts during PSC's ownership period.

257. Upon information and belief, Kriss controlled the Company's bank accounts during HCAP's ownership period.

258. Upon information and belief, Kriss continues to control the Company's bank accounts.

259. Kriss paid himself a salary through Kriss Law.

260. Kriss paid his girlfriend a salary through Kriss Law.

261. Kriss also paid expenses unrelated to the business of the Company on behalf of his family.

262. These transfers were not made for a proper purpose and harmed the financial situation of the Company.

263. These transfers also were in violation of the Loan Agreement, the Participation Agreement, and the other loan related documents.

### F. Defendants Cause the Company to Enter Into a Second Restructure and Further Deprive PSC of its Rights and Interests

264. The enterprise spearheaded by Mora and Kriss with the participation of the other Defendants—*which is continuing through the present*—consisted of calculated deception through a variety of acts as aforesaid.

265. Mora (along with the other HCAP Defendants) and Kriss (along with the other Kriss Law Defendants) suppressed the truth of the Company's actual operations and ability to operate as a going concern through 2023, into 2024, and continuing to date.

266. For example, Defendants represented to PSC that the Company was in such financial distress that there were no options besides an immediate infusion of new money from Kriss.

267. However, at the same time, Defendants were aware that forecasting showed a dip in April and May *followed by a rebound for the rest of the year* and preparing to communicate as much to investors and board members. A true and correct copy of an ACE related pitch deck is attached hereto as Exhibit 19.

268. Defendants knew that the financial strain was temporary but nevertheless used this as a means to finally force PSC out of the Company.

269. The falsehoods communicated to PSC were made via direct statements and omissions and concealments that are continuous and ranging through a plethora of transactions.

270. These falsehoods were communicated through email and over the telephone.

271. On or about May 1, 2024, J.S. Still took notice and made a series of recommendations about the Company's actions. A true and correct copy of the May 1, 2024 correspondence from Mr. Still is attached hereto as Exhibit 20.

34

272.    The recommendations included:

a.  Refining existing cash flow models to better reflect revenues and expenses;

b.  Appointing an interim CFO with sole responsibility for managing payables and finances;

c.  Creating a sub-committee of the Board that would meet each week to review the Company's cash position; and

d.  Adjusting the base infrastructure to downsize. *Id.*

273.    It is clear from J.S. Still's correspondence that HCAP and Kriss had let the finances get so out of hand that they had no idea what was going on.

274.    HCAP did not implement J.S. Still's recommendations.

275.    In fact, Defendants ignored J.S. Still's recommendations.

276.    Instead, Defendants continued spearheading an enterprise of unlawful conduct through yet another scheme to advance their ambition and further restructure their relationships and investments with one another, to get rid of PSC once and for all (the "**Second Restructure**"), and subsequently benefit from an exit of the Company in future years that could only be made possible by conduct proscribed by law.

277.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

278.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

279. ██████████████████████████████████████████████████

██████████████

280. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

281. On May 6, 2024, the terms of the Second Restructure were memorialized in a Term Sheet by and between ACE TopCo and HCAP (the "**Term Sheet**").  A true and correct copy of the Term Sheet is attached hereto as Exhibit 21.

282. The Term Sheet was executed by Kriss on behalf of ACE TopCo, on the one hand, and Mora on behalf of HCAP IV BLOCKER, LLC on the other hand.  *Id.*

283. HCAP IV BLOCKER, LLC is an affiliate of HCAP over which HCAP asserts complete dominion and control.

284. In all, the Term Sheet memorialized a transaction whereby HCAP's (and, in turn, PSC's) secured interest in the Company was severely diluted, which resulted in a powerless and substantially devalued position with little influence, access to information, or financial investment with the Company for both HCAP—and PSC, by operation of the Participation Agreement.

285. PSC was not made aware of the Term Sheet executed on May 6, 2024 until June 4, 2024.

286. Throughout the month of May 2024, Defendants concocted yet another plan and continued their overall scheme to negotiate the Second Restructure to their own benefit while keeping PSC in the dark.

287. The plan included, *inter alia*, knowingly disregarding HCAP's obligations flowing to PSC under the Participation Agreement.

288.    The foregoing was evidenced by, *inter alia*, (i) Mora sending Kriss a copy of the Participation Agreement and directing him to Section 3.03 in an email dated May 8, 2024, a true and correct copy of which is attached hereto as Exhibit 22; (ii) emails between Mora and the Company's counsel dated May 10, 2024, attached hereto as Exhibit 23; and (iii) emails between Mora and Kriss dated May 16, 2024, attached hereto as Exhibit 24.

289.    The HCAP Defendants knew that the treatment of PSC in connection with the Second Restructure was unlawful.

290.    On May 16, 2024, Mora stated to Bubnack and Mago: "If [Kriss] walks away, we get 0 now and we and [Castelli] [g]et to sue [Kriss] together.  It may be nothing but it's lawsuit upside.  If we stay we may get 4 to 6M tops and have to deal with [Castelli] lawsuit so I am torn here.  I almost prefer option 1." *See* Ex. 24.

291.    Mora and Kriss agreed to the terms of the Second Restructure in May 2024.

292.    Notwithstanding, on May 21, 2024, Mora told Castelli via email that he was still trying to work on a resolution with Kriss to the Company's financial situation.  A true and correct copy of Mora's email dated May 21, 2024 is attached hereto as Exhibit 25.

293.    This was a lie.  The terms of the deal were already agreed upon by that time.  Attorneys had already begun drafting the final underlying transaction documents.

294.    █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████

295.    Defendants were aware of the legal exposure attributed to the nature of the Second Restructure.

296. The falsehood that the Second Restructure was necessary, in the first instance, originated from Kriss.

297. For example, on May 6, 2024, Mora and Kriss exchanged emails from different states and discussed over the phone the premise that the Company was "at a point of operational standstill/insolvency." A true and correct copy of the May 6, 2024 email chain is attached hereto as Exhibit 26.

298. Mora accepted Kriss's accounting information, which should never have been consolidated with Kriss Law in the first place, to deceive PSC.

299. On June 4, 2024, Mora emailed Castelli to transmit a letter dated June 3, 2024 which purported to seek PSC's written consent to the Second Restructure—i.e., PSC's consent to the contribution, assignment, or transfer of Debt to the Company as those certain terms are used and defined therein (the "**June 3, 2024 Letter**"). A true and correct copy of the cover email and June 3, 2024 Letter (with Exhibits A - C) is attached hereto as Exhibit 27.

300. The June 3, 2024 Letter included an *unsigned* copy of the Term Sheet, an *unaudited* consolidated statement of operations from the Company (on an as if consolidated basis with Kriss Law), and a letter from the Company dated May 22, 2024, outlining the Company's purported financial distress. *Id.*

301. Unaudited financial statements consolidated with Kriss Law were inconsistent with the financial reporting requirements of the Loan Agreement, as amended, and the Participation Agreement.

302. In the June 3, 2024 Letter, Mora stated that "[i]f the Restructuring is effectuated, HCAP will continue to honor the economic interests [PSC] obtained in the Participation Agreement and grant [PSC] a pro rata participation interest in the New Equity." *Id.* This was an

38

intentional or, at minimum, negligent misrepresentation because Mora knew that the Second Restructure would result in PSC losing all interests in the Company.

303. Furthermore, notably absent from the June 3, 2024 Letter was any indication whatsoever that Mora and Kriss already had the final transaction documents in near-final form, which was indeed the case as of the date the letter was sent to Castelli.

304. To state the obvious, the draft transaction documents contemplated by the Term Sheet (or intentionally omitted therefrom) were not provided to PSC at the time.

305. The June 3, 2024 Letter required that Castelli, on behalf of PSC, "indicate [his] consent in writing … by the end of the day on June 6, 2024." *Id.*

306. This means PSC had a mere two days to evaluate the terms of the Second Restructure.

307. By contrast, Defendants had been working through the terms since on or around May 1, 2024—i.e., for over a month by this point.

308. When Mora (sitting as HCAP's corporate representative) was deposed on April 30, 2026, he was asked whether "there [was] a reason why [HCAP] waited a month to share the [T]erm [S]heet with [Castelli]."

309. Mora responded, "Again, not -- not that I can remember."

310. Mora also testified that "[i]f Mr. Castelli needed more time, he could have asked for more time." Not so, for the reasons explained below.

311. Exhibit A to the June 3, 2024 Letter was the Term Sheet.

312. ███████████████████████████████

████████████████████████████████████████

313. During Mora's deposition, he was asked whether "[he] ever t[old] [PSC] in mid-May [that] [he] [was] negotiating indemnification as part of the overall deal."

314. Mora responded, "No."

315. Mora and Kriss purposefully made no mention of the indemnification agreement when the deal was ultimately mentioned (albeit deceptively) to PSC.

316. Moreover, Kriss expressly relied on the indemnification as a reason for HCAP to not even seek PSC's consent to the Second Restructure as follows:

Hey Frank,

Looks like we are getting very close to getting this done, thanks for everything.

That said, my attorney and Greg discussed the plan of going back to Lou for one last try. Knowing Lou, we know he'll be all bluster, etc. *As such, my guy asked why you're even doing that as we have the indem, etc in place.*

Obviously, your call but I want to make sure going back to Lou and him yelling and screaming doesn't throw us off course as I have another large amount of funds I need to put in this week.

Let me know your thoughts, just want to avoid further headaches.

-Scott

*See* May 23, 2024 email, a true and correct copy of which is attached hereto as Exhibit 28 (emphasis added).

317. Exhibit B to the June 3, 2024 Letter was a financial document titled "ACE TopCo PL Consolidation TYD including Kriss Law." Ex. 27.

318. It demonstrates Kriss Law was operating at a negative loss of ███ , and with a negative EBITDA of approximately ███ .

319. The Company had no contractual obligation to service Kriss Law or maintain its financial viability.

40

320. PSC had no contractual obligation to service Kriss Law or maintain its financial viability.

321. Other companies, besides Kriss Law, professionally service real estate closings.

322. Kriss Law was not considered part of the Company in connection with the Loan Agreement, as amended, or the Participation Agreement.

323. Exhibit C to the June 3, 2024 Letter was a document titled "ACE Financial Situation Letter." Ex. 27.

324. This document only came into existence because HCAP did not want PSC to think that the Second Restructure was being proposed by HCAP.

325. Indeed, Mora testified that he asked that "the company/Scott" prepare the letter because "if I'm going to ask [Castelli] to consent because the company's in dire need of cash, he's not going to take my word for it, right?"

326. █████████████████████████████████████████████████████

327. May 6, 2024 is the same date as the Term Sheet. *Id.*

328. █████████████████████████████████████████████████████

329. This makes no sense because if that were the case, the Company would not be insolvent and the dire circumstances it was represented to be in as a basis for the Second Restructure.

330.    Further, neither HCAP nor Kriss asked PSC to invest additional operating capital into the Company prior to executing the Term Sheet.

331.    Neither HCAP nor Kriss asked PSC to invest additional operating capital in the Company because their plan was to exile PSC from the Company.

332.    Instead, HCAP and Kriss exploited a manufactured cash crunch to further advance their illicit scheme.

333.    The "ACE Financial Situation Letter" was delivered by Kriss to Mora and Bubnack at the request of Mora.  Ex. 27.

334.    The "ACE Financial Situation Letter" also appears to have been sent via mail.  *Id.*

335.    At the time, neither Mora nor Kriss provided PSC or Castelli with existing cash flow projections that showed the Company's revenue was expected to decline in April and May 2024 but that an uptick in revenue was projected for the remainder of the year.

336.    At the time, neither Mora nor Kriss provided PSC or Castelli a presentation created by HCAP's board of managers that similarly showed a dip in April and May 2024 ***but a rebound for the rest of the year.***

337.    At the time, neither Mora nor Kriss provided PSC or Castelli existing financial projections for 2025 and 2026 that showed EBITDA was expected to reach approximately ▮▮▮ and ▮▮▮, respectively, and which turned out to be fairly accurate.

338.    Notably, Section 3.01 of the Participation Agreement required HCAP to provide financial information to PSC as follows:

> **Loan Documents and Information.** To the extent requested by the Participant and subject to Section 4.03 hereof, the Lender will furnish to the Participant copies of any Loan Documents to the extent not previously provided to the Participant prior to the date hereof. The Lender will request from the Borrower (to the extent that it is entitled under the Loan Agreement to do so as a Lender thereunder) and (if and to the extent received by the Lender from the Borrower and subject to Section 4.03 hereof) promptly following receipt thereof,

furnish to the Participant copies of the financial information provided under Section 5.1 of the Loan Agreement.

Ex. 9 at § 3.01 (emphasis in original).

339. HCAP failed to provide the required information to PSC.

340. After PSC carefully reviewed the documentation that HCAP did provide, on June 4, 2024, Castelli wrote to Mora via email explaining the reasons for which PSC did not choose to consent to the Second Restructure. A true and correct copy of the relevant email chain is attached hereto as Exhibit 29.

341. On June 6, 2024, Mora wrote to Castelli via email to purportedly explain why PSC's decision was unreasonable. *Id.*

342. On June 7, 2024, Castelli wrote to Mora via email reiterating the infirmities of the underlying transaction contemplated by what he believed to be a *proposed* Term Sheet. *Id.*

343. The Second Restructure was consummated *that same day*.

344. But Mora did not notify Castelli (or anyone else at PSC) to inform PSC that HCAP and Kriss finalized the Second Restructure until **July 3, 2024**.

345. Up until that time, PSC did not know, and could not have known, that the Second Restructure had been agreed to or that its rights had been impacted.

346. To make matters worse, despite the fact that HCAP was ready to sign the requisite documents on June 7, 2024, Mora asked that counsel post-date the documents because "[i]t will be cleaner for dealing with" Castelli. A true and correct copy of Mora's email is attached hereto as Exhibit 30.

347. Mora testified that he did this simply to "avoid misunderstandings" and "provide a buffer." However, it is clear that Defendants always intended to consummate the Second Restructure with or without PSC's consent and merely sought consent for show.

348.    When Mora finally emailed Castelli on **July 3, 2024**, Mora provided Castelli with: (i) an executed copy of a certain Contribution and Exchange Agreement dated June 10, 2024 among the parties listed on Schedule I thereto and ACE TopCo; and (ii) the Fourth A+R LLC Agreement dated June 10, 2024.  A true and correct copy of the July 3, 2024 email is attached hereto as Exhibit 31. A true and correct copy of the Contribution and Exchange Agreement is attached hereto as Exhibit 32.  *See also* Ex. 14.

349.    Mora did not provide Castelli with any other documents that were part of the Second Restructure.  Ex. 31.

350.    The terms of the Term Sheet and the terms of the final documents memorializing the Second Restructure were not consistent.  *Compare* Ex. 21 *with* Ex. 32 and 14.

351.    There were material differences between the terms of the Term Sheet and the terms of the final documents memorializing the Second Restructure.

352.    Furthermore, all of the existing warrants were cancelled pursuant to the Second Restructure.

353.    At bottom, the June 3, 2024 Letter being sent to Castelli was nothing more than a charade to try to hide the unlawful conduct of an enterprise that was attempting to exile Castelli since 2022.

354.    Indeed, the overt purpose of the June 3, 2024 Letter was to request PSC's consent pursuant to Section 3.03(a) of the Participation Agreement.

355.    Section 3.03 provides in relevant part that:

[HCAP] will not, without prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of the [PSC], agree to (i) reduce the principal of any Participated Loans below the related Participation Rate; (ii) amend in any material respect the terms of the Warrant; (iii) extend the term of the Commitment; (iv) extend any stated payment date for the payment of any principal of the Participated Loans; (v) release all or substantially all of the collateral securing the Loan or all or substantially all materially

significant guarantors . . . (vi) permit any indebtedness or other rights to payment of any type that is senior or pari passu to the Loan . . . or (vii) take any action that would affect the economic interests of the [PSC] other than on a pari passu basis with the [HCAP] in its capacity as Lender under the Loan Documents[.]

Ex. 9 at § 3.03(a).

356.    In violation of this section, HCAP: (i) completely disregarded PSC's reasonable objection and refusal to consent to the Second Restructure; and (ii) consummated the Second Restructure without PSC's consent.

357.    HCAP's breach is especially egregious given that the Second Restructure extinguished PSC's warrant over PSC's objection and without its consent in direct violation of Section 3.03(a)(ii).

358.    Notably, Section 5.01 of the Participation Agreement gave HCAP the option to purchase PSC's Loan Participations within twenty business days of receipt of PSC's notice of non-consent to the Second Restructure if it wanted to proceed without PSC's consent.

359.    The value of PSC's Loan Participations was ███████████ .

360.    HCAP thus acted without PSC's consent ***and*** without purchasing PSC's Loan Participations in breach of the Participation Agreement.

361.    What is more, while HCAP was not permitted to buy out or seize the Warrants, that is exactly what it did.

362.    HCAP's position since the Second Restructure was finalized has been that PSC's consent was *not* required.

363.    At Mora's deposition (sitting as HCAP's corporate representative), Mora was asked the following pointed question regarding his understanding of Section 3.03(a): "So your understanding is that as long as [PSC] is treated pari passu, meaning that they get what HCAP gets

45

out of a transaction or restructure or whatever it is, that mean you [as in HCAP] don't need [PSC]'s consent?"

364.    Mora's response was as follows: "Correct."

365.    Second, the June 3, 2024 Letter states, "[i]f the Restructuring is effectuated, HCAP will continue to honor the economic interests [PSC] obtained in the Participation Agreement and grant [PSC] a pro rata participation interest in the New Equity."  Ex. 27.

366.    HCAP decided not to honor the issuance of Class C Units to PSC after it continued to close on the Second Restructure over HCAP's objection.

367.    Notably, while HCAP's decision to close on the Second Restructure did require PSC's consent, the fact that PSC still does not have Class C Units in the Company means HCAP and PSC were not treated pari passu, in any event.

368.    To be sure, Schedule I of the Fourth A+R LLC Agreement, which was shared with Castelli via email, does not list PSC.  *See* Ex. 14.

369.    Therefore, under any application of the terms of the Participation Agreement to the facts here, HCAP breached the Participation Agreement.

370.    Furthermore, the Contribution and Exchange Agreement, also shared with Castelli via email, actually prohibits HCAP from honoring the issuance of new Class C Units to PSC.  *See* Ex. 32 § 4(b). *See also id.* at § 3(d).

371.    Kriss and Mora were involved in drafting the Contribution and Exchange Agreement dated June 10, 2024.

372.    Kriss and Mora were also aware of the conflicting terms of the Participation Agreement.

373. The Second Restructure was designed, carried out, and finalized with a view towards exiling PSC and Castelli so that Defendants could benefit from an eventual exit of the Company entirely themselves.

374. The Second Restructure was consummated improperly for the benefit of Defendants and to the complete detriment of PSC.

375. The end result of the Second Restructure left PSC with *zero* interests in ACE TopCo, which was directly contrary to Mora's representations in the June 3, 2024 Letter. Ex. 27.

376. The bad actors ended up holding 100% of the ownership interests as follows:

a. HCAP – ▮▮▮▮ Units;

b. HCAP IV Blocker, LLC (an affiliate of HCAP) – ▮▮▮▮ Units;

c. Kriss – ▮▮▮▮ Units and ▮▮▮▮ Units;

d. ACE Closing Holdings, Inc. (an entity owned and operated by Kriss) – ▮▮▮▮ Units;

e. KL Title Services LLC (an entity owned and operated by Kriss) – ▮▮▮▮ Units;

f. Village Settlements, Inc. (an entity acquired by the Company at the direction of the Kriss Law Defendants) – ▮▮▮▮ Units;

g. RDC Advisors, LLC (of which the Company's independent director is the CEO) – ▮▮▮▮ Common Units;

h. Taylor (Senior Partner at Kriss Law) – ▮▮▮▮ Units;

i. Cuttler (Senior Partner at Kriss Law) – ▮▮▮▮ Units; and

j. Makin (COO of Kriss Law) – ▮▮▮▮ Units.

*See* Ex. 14.

377.    To be clear, PSC was not bought out of the Company.  It was pushed out of the Company unlawfully and without the receipt of any compensation in the final culmination of a plan that was carried out over a number of years, the resulting harm of which could not have been fully known by PSC until the Second Restructure.

378.    During his deposition, Mora testified that "[a]s of Q1 2026, the enterprise value of the company is listed as [$]36.4 million, using a comps analysis and a 1.44 revenue multiple, based on the comps that – that [HCAP] looked at to do the valuation after the appropriate discounts."

### G.  PSC's Prior Lawsuit and the Discovery of Defendants' Scheme

379.    On November 27, 2024, PSC filed a lawsuit against HCAP for breach of the Participation Agreement and breach of the duty of good faith in the Superior Court of California, San Diego County, Case No. 24CU025551C (the "**CA Action**").

380.    Because Defendants' scheme was concocted and carried out behind the scenes, PSC did not know, and could not have known, about it until it received internal communications from HCAP as well as communications between the HCAP Defendants and the Kriss Law Defendants through the discovery process in the CA Action.

381.    HCAP served its documents in response to PSC's discovery requests in the CA Action on March 24, 2025, April 25, 2025, and April 30, 2025.

382.    HCAP asserted that it did not have control over Kriss or Kriss Law and therefore could not produce their documents.

383.    PSC sought third-party discovery from Kriss and Kriss Law, but they never produced any documents.

48

384.    Separately, as noted above, Mora sat for a deposition on April 30, 2026 as the corporate designee of HCAP.  Mora's testimony further illuminated the unlawful nature of Defendants' conduct.

385.    No protective order governing discovery was ever entered in the CA Action.

386.    Having discovered that the issue was far larger than just a straightforward breach of the Participation Agreement and that it was not HCAP alone who is liable for the harm that resulted from the conduct set forth at length above, PSC dismissed the CA Action without prejudice on May 8, 2026 so that it could assert the more complete claims set forth herein in a forum that had jurisdiction over all of the Defendants.

## COUNT I
### Violation of RICO: 18 U.S.C. § 1962(b)
### (Against All Defendants)

387.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

388.    18 U.S.C. § 1962(b) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

389.    An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

390.    ACE TopCo qualifies as an "enterprise" because it is a legal entity.

391.    The activities of the enterprise affect interstate commerce in that ACE, through ACE TopCo, operates nationally to provide real estate related closing services.

49

392. Defendants knowingly and willfully violated 18 U.S.C. § 1962(b) using "a pattern of racketeering activity" to "acquire and maintain" their "interests and control" of ACE TopCo and, by extension, ACE.

393. Defendants further acted with knowledge of the overall fraudulent scheme.

394. Defendants' knowledge and intent may be inferred through the circumstances set forth in this Complaint.

395. As noted above, post-closing on Project Harpua, PSC owned all of the interests in ACE TopCo (then called PSC ACE Acquisition).

396. Following the Second Restructure, PSC ended up with zero interests in ACE TopCo.

397. The interests, instead, were transferred to Defendants as set forth in paragraph 366 above.

398. Defendants' racketeering activity includes:

    a. Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon sending the emails described above to PSC that contained materially false or misleading information for the purpose of deceiving PSC; and

    b. Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon sending the letters described above to PSC that contained materially false or misleading information for the purpose of deceiving PSC.

399. PSC was the target and victim of Defendants' scheme as Defendants desired to force PSC out of ACE TopCo entirely for their benefit.

400. The Kriss Law Defendants intentionally drove down the Company's EBITDA and cash flow in furtherance of the unlawful scheme between Defendants.

401.    The HCAP Defendants then acted to exacerbate the problems by refusing to consent to PSC extending a LOC to the Company that would have provided funding necessary to cover the interest payments to HCAP.

402.    The HCAP Defendants then capitalized on the financial situation to declare Events of Default under the Loan based on covenant defaults and one missed interest payment in the amount of roughly $200,000.

403.    HCAP then: (1) accelerated *over $17 million in debt* in response to the covenant defaults created by Kriss and the failure to make one interest payment that accounted for *less than 1.2% of the accelerated amount*; and (2) soon thereafter threatened to seize and sell the Company's assets.

404.    Section 6.2(c) of the Loan Agreement permitted HCAP to "make payments and do such acts as Lender considers necessary or reasonable to protect its Lien in the Collateral."

405.    HCAP knew that the "Collateral" defined in the Loan Agreement included hard assets like desks, chairs, and computers that were, for the most part, worthless.

406.    "Collateral" did not include membership interests in PSC ACE Acquisition/ACE TopCo.

407.    Defendants therefore chose to use the threat of remedies under the Loan Agreement, which they knew they did not actually want to pursue, to force a restructure that would enable them to take over the Company.

408.    Notably, after the First Restructure, when almost identical covenant and payment defaults persisted through no fault of PSC, HCAP did not act with the same level of aggression that it did when PSC owned all of the interests in PSC ACE Acquisition/ACE TopCo.

409.    To the contrary, after HCAP, in connection with the other Defendants, used these circumstances to force PSC to give up its rights, it failed or refused to declare any Event of Default, accelerate the debt, or marshal the assets.

410.    After the First Restructure and through the Second Restructure, Defendants then concealed financial information from PSC, intentionally misled PSC about the financial viability of the Company, and acted in a manner inconsistent with the applicable agreements – all towards the eventual result of completely pushing PSC out of the Company for good and usurping the ownership interests in ACE TopCo.

411.    But for Defendants' unlawful conduct in carrying out their scheme, PSC, through PSC ACE Acquisition, would not have been forced to agree to the First Restructure, which was just the first key threshold in the scheme and ultimately led to Defendants depriving PSC of all rights and interests in PSC ACE Acquisition/ACE TopCo, and ACE.

412.    Thus, as a direct and proximate result of Defendants' conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

413.    PSC is entitled to equitable relief under 18 U.S.C. § 1964(a).  PSC also is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**Violation of RICO: 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

414.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

415.    18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

416.    An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

417.    Defendants, collectively, qualify as an "enterprise" because they are a group of individuals and entities associated in fact, as shown through the conduct set forth at length above.

418.    The activities of the enterprise affect interstate commerce in that: (i) ACE, through ACE TopCo, operates nationally to provide real estate closing related services; and (ii) HCAP, a lender with its primary office in California, made a loan to borrowers from Pennsylvania and Massachusetts, respectively.

419.    Defendants knowingly and willfully violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the Company through a pattern of racketeering activity and with knowledge of the overall fraudulent scheme.

420.    Defendants' knowledge and intent may be inferred through the circumstances set forth in this Complaint.

421.    Defendants' racketeering activity includes:

   a.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon sending the emails described above to PSC that contained materially false or misleading information for the purpose of deceiving PSC; and

   b.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon sending the letters described above to PSC that contained materially false or misleading information for the purpose of deceiving PSC.

53

422. PSC was the target and victim of Defendants' scheme as Defendants desired to intentionally mismanage the Company to falsely create a dire financial situation and manufacture defaults as a means to force PSC out of ACE TopCo entirely for their benefit.

423. The Kriss Law Defendants intentionally drove down the Company's EBITDA and cash flow in furtherance of the unlawful scheme between Defendants.

424. The HCAP Defendants then acted to exacerbate the problems by refusing to consent to PSC extending a LOC to the Company that would have provided funding necessary to cover the interest payments to HCAP.

425. The HCAP Defendants then capitalized on the financial situation to declare Events of Default under the Loan based on covenant defaults and one missed interest payment in the amount of roughly $200,000.

426. HCAP then: (1) accelerated *over $17 million in debt* in response to the covenant defaults created by Kriss and the failure to make one interest payment that accounted for *less than 1.2% of the accelerated amount*; and (2) soon thereafter threatened to seize and sell the Company's assets.

427. Section 6.2(c) of the Loan Agreement permitted HCAP to "make payments and do such acts as Lender considers necessary or reasonable to protect its Lien in the Collateral."

428. HCAP knew that the "Collateral" defined in the Loan Agreement included hard assets like desks, chairs, and computers that were, for the most part, worthless.

429. "Collateral" did not include membership interests in PSC ACE Acquisition/ACE TopCo.

54

430. Defendants therefore chose to use the threat of remedies under the Loan Agreement, which they knew they did not actually want to pursue, to force a restructure that would enable them to take over the Company.

431. Notably, after the First Restructure, when almost identical covenant and payment defaults persisted through no fault of PSC, HCAP did not act with the same level of aggression that it did when PSC owned all of the interests in PSC ACE Acquisition/ACE TopCo.

432. To the contrary, after HCAP, in connection with the other Defendants, used these circumstances to force PSC to give up its rights, it failed or refused to declare any Event of Default, accelerate the debt, or marshal the assets.

433. After the First Restructure and through the Second Restructure, Defendants then concealed financial information from PSC, intentionally misled PSC about the financial viability of the Company, and acted in a manner inconsistent with the applicable agreements – all towards the eventual result of completely pushing PSC out of the Company for good and usurping the ownership interests in ACE TopCo.

434. But for Defendants' unlawful conduct in carrying out their scheme, PSC, through PSC ACE Acquisition, would not have been forced to agree to the First Restructure, which was just the first key threshold in the scheme and ultimately led to Defendants depriving PSC of all rights and interests in PSC ACE Acquisition/ACE TopCo, and ACE.

435. Thus, as a direct and proximate result of Defendants' conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

436. PSC is entitled to equitable relief under 18 U.S.C. § 1964(a). PSC also is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III
### Violation of RICO: 18 U.S.C. § 1962(d)
### (Against All Defendants)

437.   PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

438.   18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

439.   As set forth in paragraphs 380-435 above, Defendants have violated 18 U.S.C. § 1962(b) and § 1962(c).

440.   Defendants knowingly and willfully conspired with one another to carry out their illicit scheme through a pattern of racketeering activities to violate these sections.

441.   Defendants' knowledge and intent may be inferred through the circumstances set forth in this Complaint as well as the intent to participate in the conspiracy.

442.   Defendants' racketeering activities, as described above, include:

  a.   Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon sending emails to PSC that contained materially false or misleading information for the purpose of deceiving PSC; and

  b.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon sending letters to PSC that contained materially false or misleading information for the purpose of deceiving PSC.

443.   PSC was the target and victim of Defendants' scheme as Defendants desired to force PSC out of ACE entirely for their benefit.

444.   The Kriss Law Defendants intentionally drove down the Company's EBITDA and cash flow in furtherance of the unlawful scheme between Defendants.

445.    The HCAP Defendants then acted to exacerbate the problems by refusing to consent to PSC extending a LOC to the Company that would have provided funding necessary to cover the interest payments to HCAP.

446.    The HCAP Defendants then capitalized on the financial situation to declare Events of Default under the Loan based on covenant defaults and one missed interest payment in the amount of roughly $200,000.

447.    HCAP then: (1) accelerated *over $17 million in debt* in response to the covenant defaults created by Kriss and the failure to make one interest payment that accounted for *less than 1.2% of the accelerated amount*; and (2) soon thereafter threatened to seize and sell the Company's assets.

448.    Section 6.2(c) permitted HCAP to "make payments and do such acts as Lender considers necessary or reasonable to protect its Lien in the Collateral."

449.    HCAP knew that the "Collateral" defined in the Loan Agreement included hard assets like desks, chairs, and computers that were, for the most part, worthless.

450.    "Collateral" did not include membership interests in PSC ACE Acquisition.

451.    Defendants therefore chose to use the threat of remedies under the Loan Agreement, which they knew they did not actually want to pursue, to force a restructure that would enable HCAP and Kriss to take over the Company.

452.    Notably, after the First Restructure, when almost identical covenant and payment defaults persisted through no fault of PSC, HCAP did not act with the same level of aggression that it did when PSC owned all of the interests in PSC ACE Acquisition.

453. To the contrary, after HCAP, in connection with the other Defendants, used these circumstances to force PSC to give up its rights, it failed or refused to declare an Event of Default, accelerate the debt, or marshal the assets.

454. After the First Restructure and through the Second Restructure, Defendants then concealed financial information from PSC, intentionally misled PSC about the financial viability of the Company, and acted in a manner inconsistent with the applicable agreements – all towards the eventual result of completely pushing PSC out of the Company for good.

455. But for Defendants' unlawful conduct in carrying out their scheme, PSC, through PSC ACE Acquisition, would not have been forced to agree to the First Restructure, which was just the first key threshold in the scheme and ultimately led to Defendants depriving PSC of all rights and interests in PSC ACE Acquisition, ACE TopCo, and ACE.

456. Thus, as a direct and proximate result of Defendants' conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition, ACE TopCo, and ACE, and otherwise harmed in an amount to be determined at trial.

457. PSC is entitled to equitable relief under 18 U.S.C. § 1964(a). PSC also is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IV
### Fraud
### (Against HCAP and Mora)

458. PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

459. As set forth above, Mora, individually and on behalf of HCAP, repeatedly made false statements to PSC about material facts, including:

   a. HCAP's willingness and intention to exercise the remedies available to it under the Loan Agreement;

58

b.  The financial condition of the Company, most notably the Company's ability to recover from the forecasted dip in cash flow;

c.  The terms of the Second Restructure as well as the status thereof; and

d.  The impact the Second Restructure would have on PSC.

460.  Mora made these statements with knowledge of their falsity.

461.  Mora made these false statements with the intent of inducing PSC to rely upon them and agree to the First Restructure and the Second Restructure.

462.  PSC reasonably relied upon the false statements.

463.  As a direct and proximate result of HCAP's conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

464.  HCAP's and Mora's conduct was willful, wanton, and outrageous with a conscious disregard for PSC's rights.

**COUNT V**
**Negligent Misrepresentation**
*In the Alternative to Count IV*
**(Against HCAP and Mora)**

465.  PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

466.  As set forth above, at minimum, Mora, individually and on behalf of HCAP, repeatedly made misrepresentations to PSC about material facts, including:

a.  HCAP's willingness and intention to exercise the remedies available to it under the Loan Agreement;

b.  The financial condition of the Company, most notably the Company's ability to recover from the forecasted dip in cash flow;

c.  The terms of the Second Restructure as well as the status thereof; and

d.  The impact that the Second Restructure would have on PSC.

59

467.    At minimum, Mora made these misrepresentations without reasonable grounds for believing they were true.

468.    Mora made these misrepresentations with the intent of inducing PSC to rely upon the facts misrepresented.

469.    PSC reasonably relied upon the misrepresentations.

470.    As a direct and proximate result of HCAP's conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

**COUNT VI**
**Breach of Express Contract: Breach of Participation Agreement**
**(Against HCAP)**

471.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

472.    The Participation Agreement is a valid and enforceable agreement.

473.    PSC performed all of its obligations under the Participation Agreement.

474.    HCAP, however, breached its obligations in at least three respects.

475.    First, HCAP breached Section 3.01 by failing to provide the required information to PSC including, but not limited to, the financial information required under Section 5.1 of the Loan Agreement.

476.    HCAP further breached this section by improperly manipulating the accounting that was provided and consolidating financials with Kriss Law.

477.    Second, HCAP breached Section 3.03(a) by: (i) completely disregarding PSC's reasonable objection and refusal to consent to the Second Restructure; and (ii) consummating the Second Restructure without PSC's consent.

478.    Compounding its breaches, HCAP proceeded without PSC's consent *and* without purchasing PSC's Loan Participations pursuant to Section 5.01.

479.    HCAP's breaches are especially egregious given that the Second Restructure extinguished PSC's warrant over PSC's objection and without its consent in direct violation of Section 3.03(a)(ii).

480.    Finally, HCAP breached Section 3.04 by failing to exercise the requisite standard of care and willfully or negligently allowing Kriss, individually and through Kriss Law, to control the Company entirely without adequate oversight or input by HCAP to ensure the Company would be successful.

481.    As a direct and proximate result of HCAP's conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo, and ACE, and otherwise harmed in an amount to be determined at trial.

**COUNT VII**
**Breach of Implied Covenant of Good Faith and Fair Dealing: Participation Agreement**
*IN THE ALTERNATIVE TO COUNT VI*
**(Against HCAP)**

482.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

483.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

484.    Where one party is contractually afforded discretion, that discretion must be exercised reasonably and in good faith.

485.    Here, Section 3.03(b) of the Participation Agreement granted HCAP "sole discretion with respect to amendments, waivers and consents, and all actions to be taken with respect thereto" aside from the specific actions that required PSC's consent under Section 3.03(a).

486.    HCAP failed to exercise its discretion reasonably and in good faith following the execution of the Participation Agreement by taking the actions set forth at length above.

487.    As a direct and proximate result of HCAP's conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition, ACE TopCo, and ACE, and otherwise harmed in an amount to be determined at trial.

## COUNT VIII
**Breach of Fiduciary Duty**
**(Against HCAP)**

488.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

489.    Throughout the loan transaction, including the First and Second restructuring, HCAP acted beyond its mere role as a lender to direct the actions of the Company.

490.    Specifically, and among other things, HCAP was acting behind the scenes in concert with Kriss and the other Defendants to cause a decline in the Company's EBITDA for purposes of manufacturing a default.

491.    HCAP then improperly accelerated the debt for purposes of causing PSC to agree to a restructure that, unbeknownst to PSC, would give HCAP greater power and an avenue to ultimately deprive PSC of all of its rights.

492.    HCAP took actions over the objection of PSC and for its own benefit instead of PSC's or the Company's.

493.    HCAP's conduct was willful, wanton, and outrageous with a conscious disregard for PSC's rights.

494.    As a direct and proximate result of HCAP's conduct, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

## COUNT IX
### Tortious Interference with Contract
**(Against Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack)**

495.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

496.    The Loan Agreement is a valid contract between HCAP and PSC (through its then-wholly owned company).

497.    The Participation Agreement is a valid contract between HCAP and PSC.

498.    Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack were aware of these contracts and the obligations owed by HCAP to PSC thereunder.

499.    Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack took action intentionally and continually to harm the contractual relationship between HCAP and PSC, including, but not limited to, by driving down the EBITDA of ACE, refusing to consent to PSC extending a LOC to the Company, manufacturing a default, and causing HCAP to improperly accelerate the debt to force PSC to agree to the First Restructure.

500.    The aforementioned conduct disrupted the ability of PSC and HCAP to honor their respective obligations under the Loan Agreement and the Participation Agreement.

501.    The conduct of Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack was willful, wanton, and outrageous with a conscious disregard for PSC's rights.

502.    As a direct and proximate result thereof, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

## COUNT X
### Tortious Interference with Existing Business Relationship
**(Against Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack)**

503.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

504.    Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack had actual knowledge of the existing business relationship between HCAP and PSC evidenced by the Loan Agreement and the other loan related documents.

505.    Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack acted intentionally to disrupt this relationship by, among other things, creating a cash flow problem, misrepresenting the financial viability of the Company, and manufacturing grounds for a default.

506.    The aforementioned conduct disrupted the relationship between HCAP and PSC.

507.    The conduct of Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack was willful, wanton, and outrageous with a conscious disregard for PSC's rights.

508.    As a direct and proximate result thereof, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

## COUNT XI
### Aiding and Abetting Breach of Fiduciary Duty
**(Against Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack)**

509.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

510.    As discussed above, HCAP has breached its fiduciary duties owed to PSC.

511.    Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack had actual knowledge of HCAP's tortious conduct and continually provided substantial assistance or encouragement to HCAP in connection with the breaches of its fiduciary duties.

512.    Such substantial assistance includes: (1) preparing false or misleading financial information about the Company and providing such information to HCAP with the knowledge that it would be given to PSC; (2) intentionally driving down the Company's EBITDA and manufacturing defaults; and (3) refusing to provide financial information to PSC upon request.

64

513. The conduct of Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack in aiding and abetting HCAP's breaches of its fiduciary duties was a substantial factor in causing harm to PSC.

514. The conduct of Kriss, Kriss Law, Cuttler, Taylor, Makin, Mora, Shavdia, Mago, and Bubnack was willful, wanton, and outrageous with a conscious disregard for PSC's rights.

515. As a direct and proximate result thereof, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

**COUNT XII**
**Civil Conspiracy**
**(Against All Defendants)**

516. PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

517. As set forth at length above, at all relevant times, Defendants acted in concert with one another to formulate and execute an illicit scheme to oust PSC from the Company for their own benefit.

518. The Kriss Law Defendants took action in furtherance of this conspiracy by, *inter alia*, intentionally mismanaging the Company and improperly accounting to cause a covenant breach and reduce cash flow to cause a payment default.

519. The HCAP Defendants took action in furtherance of this conspiracy by, *inter alia*, refusing to consent to PSC extending a LOC to the Company, working with Kriss and Kriss Law to manufacture a default, improperly accelerating the debt to force a restructure, and agreeing to further restructures and changes to the Loan over the objections of PSC and for the purposes of depriving PSC of its interests in the Company.

520.    The unlawful conduct gives rise to underlying tort claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with contract, and tortious interference with the business relationship.

521.    Defendants' conduct was willful, wanton, and outrageous with a conscious disregard for PSC's rights.

522.    As a direct and proximate result thereof, PSC was wrongfully deprived of its interests in PSC ACE Acquisition/ACE TopCo and ACE, and otherwise harmed in an amount to be determined at trial.

## COUNT XIII
### Declaratory Judgment
### (Against Defendants and Nominal Defendants)

523.    PSC incorporates by reference the foregoing paragraphs as if set forth fully herein.

524.    Pursuant to the Federal Declaratory Judgment Act,

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

525.    Additionally, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."  28 U.S.C. § 2202.

526.    Here, an actual controversy exists with respect to the parties' respective status under the contracts and other documents related to Project Harpua, the First Restructure, and the Second Restructure because the dispute is definite and concrete, touching the legal relations of the parties having adverse legal interests.

527.    The dispute, as explained at length above, is real and substantial. A declaratory judgment is necessary for the continuation of any business by the Company.

528.    PSC seeks specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

529.    As set forth at length above, but for the illicit and unlawful conduct of Defendants, PSC, through PSC ACE Acquisition, would not have been forced to enter into the First Restructure.

530.    Indeed, accelerating the debt, a key piece of the forcing of the First Restructure, was not done properly or in good faith.

531.    But for the First Restructure, Defendants could not have continued in their unlawful scheme to deprive PSC of its interests in the Company through the Second Restructure.

532.    PSC requests the entry of a declaratory judgment setting forth the viability of the contracts at issue as well as the parties' respective rights thereunder as follows:

a.   The Notice of Default and Notice of Acceleration are null and void;

b.   All contracts related to the First Restructure are invalid and/or rescinded;

c.   All contracts related to the Second Restructure are invalid and/or rescinded;

d.   All amendments to the Operating Agreement for PSC ACE Acquisition/ACE TopCo are invalid and/or rescinded;

e.   All amendments to the TSA and Employment Agreement are invalid and/or rescinded;

f.   Ownership of PSC ACE Acquisition/ACE TopCo and the related entities shall be as it was upon closing of Project Harpua as follows:

i.     PSC ACE Acquisition – 100% owned by PSC;

ii.    ACE – 100% owned by PSC ACE Acquisition;

67

   iii. Kriss Title Services, LLC – 50% owned by PSC ACE Acquisition and 50% owned by non-party RG Title, LLC; and

   iv. New England Title Partners, LLC – 50% owned by PSC ACE Acquisition and 50% owned by non-party JD Title Ventures, LLC;

 g. Any units in ACE TopCo held by any Defendant or Nominal Defendant are cancelled; and

 h. In the alternative to subparagraphs F and G, the value of the interests in the foregoing entities is in excess of $36.4 million.

## PRAYER FOR RELIEF

1. For general damages according to proof at trial;

2. For prejudgment interest;

3. For reasonable attorneys' fees and costs;

4. For treble damages under 18 U.S.C. § 1964(c);

5. For punitive damages;

6. For imposition of a constructive trust and appointment of a monitor and/or receiver or other injunctive relief;

7. For an order under 18 U.S.C. § 1964(a) or under this Court's inherent powers granting all appropriate equitable relief to prevent and restrain violations of 18 U.S.C. § 1962;

8. Rescission of all contracts related to the First Restructure and the Second Restructure to return the parties to the position they were in prior to the First Restructure including:

 a. Rescission of all amendments to the LSA, ACE TopCo Operating Agreement, TSA, and Employment Agreement;

b. Rescission of all documents related to the First Restructure including, but not limited to, the Participation Agreement;

c. Rescission of all documents related to the Second Restructure;

d. Cancelling all existing units in ACE TopCo held by any Defendant or Nominal Defendant;

e. Restoring the ownership of interests in ACE TopCo to PSC; and

f. Restoring the ownership interests in ACE and the other related entities to reflect the ownership structure post-closing on Project Harpua as set forth herein;

9. In the alternative, rescissory damages equal to the value of the units in ACE TopCo;

10. A declaratory judgment as set forth herein; and

11. For such other relief that the Court deems appropriate.


[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated: July 1, 2026 By: */s/ Matthew Faranda-Diedrich*
Matthew Faranda-Diedrich (ID No. 203541)
Isabella H. Gray (ID No. 328803)
David S. Hollander (ID No. 327709)
Three Logan Square
1717 Arch Street, 47th Floor
Philadelphia, PA 19103
267-546-0275 (phone)
484-362-2630 (fax)
mfd@rccblaw.com
igray@rccblaw.com
dhollander@rccblaw.com

*Attorneys for Plaintiff, PennSpring Capital VII, LLC*

## JURY DEMAND

Plaintiff, PennSpring Capital VII, LLC, demands a jury trial on all issues so triable.

*/s/ Matthew Faranda-Diedrich*
One of the attorneys for Plaintiff

70

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Louis Castelli, declare under penalty of perjury under the laws of the United States of America that I am authorized to make this verification on behalf of Plaintiff, PennSpring Capital VII, LLC, and that, to the best of my knowledge, the factual allegations contained in the foregoing Verified Complaint are true and correct.

Dated: July 1, 2026

DocuSigned by:

*Louis Castelli*

B7CD49F758FB4D8...

Louis Castelli